UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MERITA VILEN-BURCH, | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
|     *vs.* | ) | 1:13-cv-00216-JMS-TAB |
| | ) | |
| JERRY L. BURCH, | ) | |
|     *Defendant.* | ) | |

## ORDER

Presently pending before the Court is Petitioner Merita Vilen-Burch's Amended Complaint and Petition for Return of the Children, [dkt. 11]. The Court held a hearing regarding the Petition on May 1, 2013, during which time the parties presented evidence and the Court heard argument. Having considered that evidence and argument, and the parties' written submissions, the Court **GRANTS** Ms. Vilen-Burch's Petition for the reasons set forth below.[1]

## I.
### STANDARD

The Hague Convention on the Civil Aspects of International Child Abduction, 19 I.L.M. 1501 (1980) (the "Hague Convention"), to which both Finland and the United States are parties, "entitles a person whose child has wrongfully been [retained in] the United States…to petition for return of the child to the child's country of 'habitual residence,' unless certain exceptions apply." *Norinder v. Fuentes*, 657 F.3d 526, 529 (7th Cir. 2011). The overarching purpose of the Hague Convention is to return a child to its habitual residence and for that residence to decide

---

[1] On May 1, 2013, the Court issued an Order granting Ms. Vilen-Burch sole custody of the children for the sole purpose of returning them to Finland, ordering Mr. Burch to cooperate in securing necessary passports and travel paperwork to facilitate the return of the children to Finland within seven days unless Ms. Vilen-Burch and Mr. Burch reach an agreement providing for a different return date, and directing that further proceedings with respect to the custodial arrangement for the children must occur within the appropriate court in Finland. [Dkt. 33.] This Order provides a detailed discussion of the Court's rationale for the May 1, 2013 Order.

custodial issues.  *See Barzilay v. Barzilay*, 600 F.3d 912, 916-17 (8th Cir. 2010) (purpose of Hague Convention proceedings is "not to establish or enforce custody rights, but only 'to provide for a reasoned determination of where jurisdiction over a custody dispute is properly placed'") (*quoting Yang v. Tsui*, 416 F.3d 199, 203 (3d Cir. 2005)).  The requesting court's sole and limited role is to determine whether the child should be returned to his or her habitual residence for a court there to determine custody.  *See Luedtke v. Luedtke-Thomsen*, 2012 U.S. Dist. LEXIS 90584, *2 (S.D. Ind. 2012) ("courts entertaining [Hague Convention] petitions must refrain from determining the merits of underlying child custody claims…; rather, the purpose of these proceedings is to return the parties to the status quo").

Ms. Vilen-Burch brings her Amended Complaint under the International Child Abduction Remedies Act (the "<u>ICARA</u>"), 42 U.S.C. §§ 11601, *et seq.*, which implements the Hague Convention.  The Seventh Circuit Court of Appeals has described the ICARA in the following way:

> The Act provides for the return of a child wrongfully removed to the United States in violation of the [Hague] Convention….As we explained…, wrongful removal is defined as removal "in breach of rights of custody" vested in the party who complains of the removal; to prevent forum shopping, rights of custody are defined according to the law of the country that is the child's "habitual residence."…The first step for a court considering a petition is to determine the child's habitual residence.  The forum-shopping concern, we have said, means that habitual residence must be "based on the everyday meaning of these words rather than on the legal meaning that a particular jurisdiction attaches to them,"…for example, habitual residence is not necessarily the same as a jurisdiction's conception of "domicile,"….The question is whether a prior place of residence…was effectively abandoned and a new residence established…"by the shared actions and intent of the parents coupled with the passage of time."….Often parents will not agree about what their shared intentions were once litigation is underway, and so we must take account of the parents' actions as well as what they say.

*Norinder*, 657 F.3d at 533-34.

The petitioner in a Hague Convention case must prove by a preponderance of the evidence that the removal or retention of the child was "wrongful" in order for return to be warrant-

ed.  Removal or retention is considered wrongful where it is in breach of custody rights established by the child's habitual residence and, at the time of the wrongful removal or retention, the petitioner was exercising his or her custodial rights.  *Koch v. Koch*, 450 F.3d 703, 712 (7th Cir. 2006).

Custody rights can arise by operation of the law of the State of habitual residence, and need not be conferred by a court.  51 FR 10494.  The parent seeking return of the child must also establish that he or she was exercising custody rights at the time of the removal or retention, but "[v]ery little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised.  The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child."  *Id.*

There are some exceptions to the obligation to return a wrongfully removed or retained child, but application of those exceptions by the court is discretionary, not mandatory.  They include: (1) where the parent seeking return was not actually exercising custody rights at the time of the removal or retention, or had consented to or acquiesced in the removal or retention – which the parent opposing return must prove by a preponderance of the evidence; (2) where there is a grave risk that return would expose the child to physical harm or otherwise place the child in an intolerable situation – which the parent opposing return must prove by clear and convincing evidence; and (3) where the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of the child's views – which the parent opposing return must prove by a preponderance of the evidence.  *Id.*; 42 U.S.C. § 11603(e). There is also a public policy exception in Article 20, which states that "[t]he return of the child under the provisions of Article 12 may be refused if this would not be permitted by the funda-

mental principles of the requested State relating to the protection of human rights and fundamental freedoms," which the parent opposing return must prove by clear and convincing evidence. 19 I.L.M. 1501; 42 U.S.C. § 11603(e)(2)(b).

The Federal Rules of Evidence apply during petition hearings, "with the exception that authentication of documents is not required." *Luedtke*, 2012 U.S. Dist. LEXIS 90584 at *2. *See also* 42 U.S.C. § 11605; Fed. R. Evid. 1101(b). An order granting or denying a petition must be supported by findings of fact on key issues. *Luedtke*, 2012 U.S. Dist. LEXIS 90584 at *2-3; Khan v. Fatima*, 680 F.3d 781, 788 (7th Cir. 2012).

The Court has given Ms. Vilen-Burch's Petition expedited treatment, as required by the Hague Convention. 19 I.L.M. 1501 ("[t]he judicial or administrative authority of contracting states shall act expeditiously in proceedings for the return of the children").

## II.
### FINDINGS OF FACT

Ms. Vilen-Burch filed a Verified Complaint and Petition for Return of the Children, [dkt. 1], on February 6, 2013. She then filed an Amended Complaint on February 25, 2013, which was substantively the same as the Complaint but redacted certain identifying information and attached exhibits inadvertently omitted from the Complaint. [Dkt. 11.] The parties conferred with the magistrate judge and agreed on a May 1, 2013 hearing date. [Dkt. 15.]

Ms. Vilen-Burch, who is represented by counsel, and Mr. Burch, *pro se*, are the parents of a thirteen-year-old daughter ("H") and an eleven-year-old son ("S"). Ms. Vilen-Burch and Mr. Burch were married on June 18, 1999 in Cozumel, Mexico. At the time of their marriage, Ms. Vilen-Burch lived in Finland and Mr. Burch lived in the United States. Mr. Burch moved to Finland in February 2000, and they lived in Finland – where both H and S were born – until 2003

when they moved to Texas.  They lived in Texas until 2006, and then moved back to Finland where Ms. Vilen-Burch and Mr. Burch physically separated in 2008.

Upon their separation, H and S remained in Ms. Vilen-Burch's physical custody.  Mr. Burch stayed in Finland for approximately six months, and then moved to Venice, Florida where he lived until 2010.  In 2010, he moved to Connersville, Indiana where he currently lives.

H and S visited their paternal grandparents, Jerry and Sue Burch, in the United States from June 27, 2008 to August 4, 2008.  Both Ms. Vilen-Burch and Mr. Burch signed a Contract stating "[o]ur common children [H and S], who permanently live and reside in Finland, may go and visit their grandparents in USA between 27 of June, 2008 and August 4th, 2008.  Children have to be **absolutely** returned back to Finland."  [Dkt. 11-2 (emphasis in original).]  Mr. Burch did not accompany H and S on their visit.

In the summer of 2009, H and S visited Mr. Burch – who had moved to the United States in late 2008 – in the United States from May 31 through July 8.  Ms. Vilen-Burch and Mr. Burch's father, also named Jerry Burch, signed a Contract which provided "[H and S,] the children of Merita Vilen-Burch and Jerry Burch II, who permanently live and reside in Finland, may go and visit their father and grandparents in USA between 31st of May and 8 of July, 2009.  Children have to be **absolutely** returned back to Finland."  [Dkt. 11-3 (emphasis in original).]  The Contract was signed by Mr. Burch's father rather than Mr. Burch because Mr. Burch's passport had been revoked for nonpayment of child support for different children from a previous relationship, so Mr. Burch's father was required to transport the children back to Finland.

On June 23, 2009, the Helsinki, Finland District Court issued a Judgment of Divorce for Mr. Burch and Ms. Vilen-Burch.  [Dkt. 11-1.]  The Judgment of Divorce does not address custo-

dy arrangements for H and S, but merely states that "Judgment of divorce between the spouses is pronounced."

H and S again visited Mr. Burch during the summer of 2011 in Connersville, Indiana, where he was living. The visit was scheduled to take place from May 28 through August 10, but Ms. Vilen-Burch and Mr. Burch agreed to extend the childrens' stay through the 2011-2012 academic year so that H and S could attend school in Connersville, Indiana. Mr. Burch wrote in an email to Ms. Vilen-Burch that "I have my work cut out for…me for the next 12 months!" [Dkt. 11-6 at 2.] Ms. Vilen-Burch advised the school that H and S attended in Finland that they would be spending that academic year in the United States. Mr. Burch was supposed to change the return airline flights for H and S to the following June 2012.

Ms. Vilen-Burch spoke frequently with H and S during the 2011-2012 school year, either by telephone or Skype. They would discuss what was going on in the childrens' lives, but did not discuss the possibility of the children staying longer than the 2011-2012 school year. Ms. Vilen-Burch visited H and S in the United States several times during the 2011-2012 school year. In November 2011, Ms. Vilen-Burch took H and S to Carmel, Indiana where they spent the weekend together to celebrate H's birthday. In February 2012, Ms. Vilen-Burch took H and S to Cincinnati, Ohio for a weekend to celebrate her birthday and S's birthday.

In May 2012, Ms. Vilen-Burch began discussing summer plans for H and S with Mr. Burch, including when the children would return to Finland. When Mr. Burch hung up on her during a telephone call regarding scheduling the childrens' return, Ms. Vilen-Burch realized that the situation was serious and that Mr. Burch did not intend to return them to Finland. Mr. Burch did not, in fact, return the children to Finland in June 2012 as he and Ms. Vilen-Burch had agreed. That same month, Ms. Vilen-Burch consulted an attorney in Helsinki, Finland and also

the Finland Ministry of Justice. A Request for Return was filed with the United States Department of State on Ms. Vilen-Burch's behalf on June 18, 2012. Ms. Vilen-Burch also notified school officials in Connersville, Indiana that she did not consent to the childrens' continued enrollment and attendance at the Connersville schools and that Mr. Burch was not allowed to sign any forms on her behalf.

During the summer of 2012, Ms. Vilen-Burch stayed with friends in Ohio in hopes that Mr. Burch would ultimately allow the children to return to Finland with her. Mr. Burch told Ms. Vilen-Burch that she could spend one to two weeks with H and S in Florida if she would sign a form allowing the children to stay for the 2012-2013 school year. Ms. Vilen-Burch refused to sign the form, and Mr. Burch did not allow her to spend time with the children in Florida.

Ms. Vilen-Burch continued to speak with H and S via telephone and, at the beginning of the summer of 2012, they still had meaningful conversations. In August 2012, when Mr. Burch became aware that Ms. Vilen-Burch had contacted the State Department and initiated proceedings to have the children returned to Finland, however, H and S began to exhibit disinterest in communicating with her.

In November 2012, around Thanksgiving, Mr. Burch agreed to let H and S spend a long weekend with Ms. Vilen-Burch in Indianapolis, but Mr. Burch abruptly picked the children up on the second day of the visit. In December 2012, Ms. Vilen-Burch came to the United States in hopes of spending one week with H and S during their two-week Christmas vacation from school. Ms. Vilen-Burch thought the children should have a "normal" Christmas day with Mr. Burch, his mother, and their aunt, uncle, and cousins, but asked Mr. Burch if she could spend their second week of vacation with them. Mr. Burch refused and, instead, only allowed the children to meet Ms. Vilen-Burch at a shopping mall in Indianapolis, Indiana on December 27, 2012

for fifteen minutes. Ms. Vilen-Burch again travelled to the United States in February 2013 in hopes of spending her birthday with H and S, but Mr. Burch refused to let her see the children. Since the December 27, 2012 encounter, Ms. Vilen-Burch has seen the children at some of S's sports events, after obtaining his team schedule from the organization where S plays.

Testimony at the hearing indicated that, since August 2012, Ms. Vilen-Burch offered the possibility of Mr. Burch returning the children to Finland and Ms. Vilen-Burch and Mr. Burch entering into a formal custody agreement in the United States. However, no such agreement was ever reached.

### III.
#### DISCUSSION

Ms. Vilen-Burch argued that H and S resided with her in Finland from 2008 until the 2011-2012 academic year, when she and Mr. Burch agreed to allow them to complete one school year in the United States. [Dkt. 11 at 4, ¶ 16.] Ms. Vilen-Burch alleged that Mr. Burch's intention to agree to only a one-year extension to their stay is shown by his comment in an email exchange that "I have my work cut out for…me for the next 12 months!," [dkt. 11-6 at 2], and that her intention that the stay only be extended by a year is shown by her notices to the school in Finland regarding one year abroad, [dkts. 11-7; 11-8].

Ms. Vilen-Burch further argued that the Child Custody and Right of Access Act of Finland ("Finland Act") provides that married parents are the custodians of children born during the marriage and, since the Judgment of Divorce does not address custody, Ms. Vilen-Burch and Mr. Burch have joint custody. [Dkt. 11 at 4, ¶ 20.] She asserted that by their conduct, she and Mr. Burch demonstrated their agreement that H and S would reside with her from 2008 to 2012, with a year abroad for the 2011-2012 school year. [*Id.* at 4, ¶ 21.] She also argued that part of her custodial rights included the authority to make decisions regarding the care, upbringing, and

place of residence of the children, and that for matters of great significance the custodians may only make a joint decision. [*Id.* at 4-5, ¶¶ 22-23.] Finally, she asserted that she was exercising her custody rights from 2008 until Mr. Burch wrongfully retained H and S, and that she notified school officials and filed a Request for Return with the State Department, [dkt. 11-11], when she learned that Mr. Burch intended to wrongfully retain H and S in the United States. [*Id.* at 5, ¶¶ 26-27.]

Ms. Vilen-Burch sought an order requiring the prompt return of H and S to Finland, an order requiring Mr. Burch to show cause why he has kept the children from her in contravention of Finnish law, attorneys' fees and costs, and the travel expenses she has incurred related to seeking the return of the children. [*Id.* at 5, ¶ 28.]

In response, Mr. Burch attempted to refute the habitual residency element by questioning Ms. Vilen-Burch about her whereabouts during the 2011-2012 school year and whether she holds bank accounts in the United States, and by challenging the accuracy of certain United States addresses she gave to public officials to obtain a Florida driver's license and to register an automobile. He also relied upon two exceptions to the Hague Convention. First, he argued that Article 20's "Public Policy Defense" applies based on Ms. Vilen-Burch's involvement in a criminal investigation in Finland whereby she acted as a whistle-blower and reported one of her work colleagues for allegedly defrauding the company that they worked for. [Dkt. 28 at 11.] Second, Mr. Burch argued that H and S want to remain in the United States, relying on Article 13 which allows the Court to refuse return of the children if they object to being returned and have attained an age and degree of maturity that shows it is appropriate to take their views into account. [*Id.* at 12.]

### A. Habitual Residence

The first question the Court must decide is where H and S habitually resided when they came to visit Mr. Burch in the summer of 2011. This case is one of wrongful retention, not wrongful removal. *See Walker v. Walker*, 701 F.3d 1110, 1118 (7th Cir. 2012) (where children went to United States with both parents, but mother later refused to return them to Australia where father resided, case was considered one of wrongful retention and not wrongful removal since children went to United States with both parents' permission). It is not a situation where Ms. Vilen-Burch accuses Mr. Burch of "kidnapping" the children, as Mr. Burch has told H.

In determining where a child's habitual residence is in a wrongful retention case, a court should ask "whether a prior place of residence…was effectively abandoned and a new residence established…'by the shared actions and intent of the parents coupled with the passage of time.'" *Norinder*, 657 F.3d at 534 (*quoting Koch*, 450 F.3d at 715). "Because the parents often dispute their intentions, 'the court should look at actions as well as declarations' in determining whether the parents 'shared an intent to abandon a prior habitual residence.'" *Walker*, 701 F.3d at 1119 (*quoting Koch*, 450 F.3d at 715). "'When the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period [of time the child has been in the country] need not be long.'" *Norinder*, 657 F.3d at 534 (*quoting Mozes v. Mozes*, 239 F.3d 1067, 1078 (9th Cir. 2001)).

Ms. Vilen-Burch argued that H and S habitually resided in Finland from 2008 (when she and Mr. Burch physically separated) up to the 2011 visit that led to their wrongful retention. [Dkt. 25 at 5.] Mr. Burch conceded that Indiana is not H and S's habitual residence, [dkt. 28 at 12], and did not suggest that they had another habitual residence in the United States. Additionally, while Mr. Burch set forth extensive – and often irrelevant – facts regarding where the fami-

ly has lived, his detailed account ends abruptly when he and Ms. Vilen-Burch physically separated. [*Id.* at 11.] He did not address at all the time period after the physical separation at the end of 2007. [*Id.*]

Mr. Burch's main argument regarding habitual residence, which he attempted to present at the hearing and appeared to present in his filings, is that he and Ms. Vilen-Burch were somehow duped into moving to Finland in the first place because the company that offered Ms. Vilen-Burch employment, Arctic Image Ltd. ("AI") – which was the ultimate reason for their move – was allegedly being defrauded by its Chief Executive Officer. The Court finds the motivation behind the company's offer of employment to Ms. Vilen-Burch, and the fact that the employment ended up lasting only a short time, to be wholly irrelevant to the fact that Mr. Burch and Ms. Vilen-Burch jointly agreed to move to Finland, and H and S remained residents of Finland up to their summer 2011 visit to the United States. Mr. Burch attempted to further argue that somehow Ms. Vilen-Burch financially coerced him to moving to Finland and that as the sole breadwinner she financially prevented a residence in the United States. But again, it is the status of habitual residence that the Court was required to determine, not the reason for it.

Moreover, the evidence here established that Ms. Vilen-Burch and Mr. Burch only intended that H and S stay in the United States for the 2011-2012 academic year. Ms. Vilen-Burch advised the school that H and S attended in Finland that they would be taking a year abroad to attend school in the United States, and Mr. Burch commented in an email message that he had his work "cut out" for him for the "next 12 months" when the two reached an agreement regarding the 2011-2012 academic year. Mr. Burch presented no evidence showing that either he Ms. Vilen-Burch intended for H and S to stay any longer at that time. The Court concludes that Fin-

land was H's and S's habitual residence when they travelled to the United States in 2011 to visit Mr. Burch.

### B. Wrongful Retention

Next, the Court must determine whether Mr. Burch wrongfully retained H and S. A retention is wrongful when:

a. it is in breach of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

19 I.L.M. 1501. The Court will look to the law of Finland regarding parental custody rights, and takes judicial notice of the Finland Act,[2] which provides:

Section 4 – Duties of a custodian

(1) The custodian of a child shall ensure his well-being and development, as provided for in section 1. For this purpose the custodian shall have the authority to make decisions on the care, upbringing and place of residence of a child and on other matters relating to the person of the child.
(2) Before making a decision on a matter relating to the person of a child, a custodian shall discuss the matter with him, if this is possible in view of the age and stage of development of the child and the nature of the matter. When making the decision the custodian shall give due consideration to the opinion and wishes of the child.
(3) The custodian shall represent a child in matters relating to his person, unless otherwise provided by law.

---

[2] Article 14 of the Hague Convention authorizes the Court to take judicial notice of the law of the place of habitual residence of the children "without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." 19 I.L.M. 1501.

Section 5 – Joint exercise of custody

(1) The custodians of a child shall be jointly responsible for the duties inherent to custody and make joint decisions relating to the child, unless otherwise provided or ordered.
(2) [I]n a matter that is of great significance for the future of the child, the custodians may only make a joint decision, unless it is clear that the best interests of the child do not require the same.

There is no formal agreement or court order regarding custody of H and S. Based on the Finland Act, the Court concludes that Mr. Burch and Ms. Vilen-Burch had joint custody of H and S when the children came to visit Mr. Burch in the United States in 2011. By retaining H and S in the United States past the agreed-upon school year, Mr. Burch "effectively precluded [Ms. Vilen-Burch] from caring for the children or having any say in where the children would reside." *Luedtke*, 2012 U.S. Dist. LEXIS 90584 at *13. Accordingly, Mr. Burch has breached Ms. Vilen-Burch's custody rights and his retention of the children in the United States is wrongful.

The Court must also determine whether Ms. Vilen-Burch was exercising her custody rights before Mr. Burch wrongfully retained H and S in the United States. Demonstrating exercise of custody rights is a low bar, and exercise is found when "a parent with de jure custody rights keeps or seeks to keep, any sort of regular contact with his or her child." *Walker*, 701 F.3d at 1121 (*quoting Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007)). Ms. Vilen-Burch argued that H and S lived with her from 2008 to 2011, visiting Mr. Burch in the summer for short periods of time, and that she and Mr. Burch agreed that H and S would only spend the 2011-2012 school year in the United States, and nothing more. Mr. Burch has not presented any evidence indicating otherwise. The Court concludes that Ms. Vilen-Burch was exercising her custody rights when H and S were wrongfully retained.

Ms. Vilen-Burch has established by a preponderance of the evidence that Mr. Burch has wrongfully retained H and S in the United States. The Court will go on to consider whether the exceptions that Mr. Burch raises would preclude their return to Finland.

### C. The Public Policy Exception

Article 20 of the Hague Convention provides that "[t]he return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." 19 I.L.M. 1501. Mr. Burch appeared to argue that Ms. Vilen-Burch's former employment at AI, and the fact that Ms. Vilen-Burch eventually became a whistle-blower and assisted in the investigation and prosecution of AI's Chief Executive Officer, somehow supports application of the public policy exception. [Dkt. 28 at 11.]

"Although…exceptions or defenses are available, numerous interpretations of the [Hague] Convention caution that courts must narrowly interpret the exceptions lest they swallow the rule of return." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009). The public policy defense upon which Mr. Burch relies is "meant to be 'restrictively interpreted and applied…on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process.'" *Habrzyk v. Habrzyk*, 759 F.Supp.2d 1014, 1027 (N.D. Ill. 2011) (*quoting Hazbun Escaf v. Rodriquez*, 200 F.Supp.2d 603, 614 (E.D. Va. 2002)); *see also Arguelles v. Vasquez (In re Hague Child Abduction Application)*, 2008 U.S. Dist. LEXIS 97048, *15 (D. Kan. 2008) ("Article 20 envisioned a *limited situation* where *human rights concerns*, most likely defined within the parameters of other international agreements, would prohibit return") (emphasis in original). Mr. Burch must prove application of this exception by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

Mr. Burch's discussion of Ms. Vilen-Burch's experiences relating to AI and her interactions with AI's Chief Executive Officer is murky. Mr. Burch appeared to assert at the hearing that the family's move to Finland was entirely based on Ms. Vilen-Burch's employment with AI and, since the Chief Executive Officer allegedly defrauded AI, the family's move to Finland was somehow fraudulently induced. But the motivations of Mr. Burch and Ms. Vilen-Burch for moving back to Finland in 2006, and having H and S live there up to their visit to the United States in the summer of 2011, are irrelevant in the context of applying the public policy exception. Mr. Burch has not presented any evidence that returning H and S to Finland would raise human rights concerns or shock the conscience of the Court – a showing which is necessary for the exception to apply.

### D. The Mature Child Exception

Mr. Burch also argues that the exception found in Article 13 of the Hague Convention precludes H and S's return to Finland. Article 13 provides in relevant part that "[t]he judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." 19 I.L.M. 1501. There is "a 'demonstrated disinclination' among courts to defer to a child's objection as a basis to deny a petition." *Trudrung v. Trudrung*, 686 F.Supp.2d 570, 578 (M.D. N.C. 2010). Further, the child's wishes should not be considered when those wishes are "the product of undue influence" from the parent objecting to return. *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007). *See also* 51 FR 10494 ("A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child").

The Court questioned H and S separately, *in camera*. Given S's age, and his understandably emotional state while testifying, the Court finds that S has not attained an age and degree of maturity to invoke the exception. Moreover, he disclosed considerable influence by Mr. Burch, who had S promise the morning of the hearing that he would "never leave [Mr. Burch]'s side." Accordingly, the Court finds it improper to consider his testimony in determining whether the exception applies. *See, e.g., Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007).

The Court further finds that, while H appears to have the maturity of an average thirteen-year-old, her expression of a generalized desire to remain in the United States, coupled with the Court's finding that she has been strongly influenced by Mr. Burch, lead to the conclusion that the mature child exception does not apply here. H articulated a desire to remain in the United States because she is involved in various extracurricular activities, she believes she will do better in school here than she would in Finland, and she does not want to move again. These reasons are simply not sufficient to invoke the exception. *See Locicero v. Lurashi*, 321 F.Supp.2d 295, 298 (D. P.R. 2004) ("The fact that the [thirteen year-old] child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sports activities and outings, is not enough for this Court to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return").

The Court also cannot consider H's wishes to remain in the United States because it finds that she has been unduly influenced by Mr. Burch. H's testimony indicated that Mr. Burch has given her certain information regarding these proceedings that is false and/or meant to malign Ms. Vilen-Burch or cause H and S to mistrust her – for example, that Ms. Vilen-Burch is accusing Mr. Burch of "kidnapping," which is not the case, and that she has accused Mr. Burch of "brainwashing" H and S. The Court also finds it highly likely that H's articulated belief that Ms.

Vilen-Burch "put her in the position" of testifying has been formed as a result of Mr. Burch's influence. Indeed, it is Mr. Burch who called the children as witnesses, and his wrongful retention that necessitated these Court proceedings. Mr. Burch's influence leads the Court to discount H's testimony, and it declines to apply the mature child exception.

### E. Ms. Vilen-Burch's Request for Fees and Costs

Ms. Vilen-Burch also requests that the Court award her attorneys' fees and costs, including the transportation expenses she has incurred as a result of Mr. Burch's wrongful retention of H and S. [Dkt. 11 at 6.] ICARA provides that:

> Any court ordering the return of a child pursuant to an action brought under section 4 [42 USCS § 11603] shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

42 U.S.C. § 11607(b)(3).

Ms. Vilen-Burch presented evidence regarding her attorneys' fees and costs, and the travel expenses she has incurred. Mr. Burch did not contest those amounts, and the Court finds that they are appropriate. Accordingly, it awards Ms. Vilen-Burch $23,140.76 – which is the total of $13,785.76[3] in attorneys' fees and costs and $9,355 in Ms. Vilen-Burch's travel expenses related to seeking the return of the children.

---

[3] The Court has reduced the amount of attorneys' fees and costs by $400 because Ms. Vilen-Burch's counsel had included an estimated time of eight hours for the May 1, 2013 hearing on the invoice submitted at the hearing. Since the hearing only lasted six hours, the Court subtracted $400 (or $200 per hour) from the total amount of fees.

## IV.
### CONCLUSION

As set forth in the Court's May 1, 2013 Order, [dkt. 33], the Court **GRANTS** Ms. Vilen-Burch's Petition for Return of the Children, [dkt. 11]. Additionally, Ms. Vilen-Burch is awarded $23,140.76 in attorneys' fees and costs, and in travel expenses. Judgment will enter accordingly.

Mr. Burch's obligation to cooperate in securing necessary passports and travel paperwork to facilitate the return of H and S to Finland,[4] as discussed in the Court's May 1, 2013 Order, remains in effect until the children are returned to Finland. Additionally, neither Mr. Burch nor any person acting at his direction or in concert or participating with him shall take any action to remove H or S from the jurisdiction of this Court pending the children's return to Finland, under penalty of contempt of this Court's Order. Mr. Burch's failure to comply with any provision of this Court's Order will be in contempt of this Court's Order and may subject him to sanctions including a fine, attachment, imprisonment, and the seizure from him and retention of the children by the appropriate authorities.

Despite finding that the return of H and S to Finland is justified under the Hague Convention, the Court notes that nothing prevents Ms. Vilen-Burch and Mr. Burch from continuing to try to effectuate a formal custody agreement in Finland or the United States. They appeared to work cooperatively until Mr. Burch wrongfully retained the children past the June 2012 agreed-upon return date. Based on Mr. Burch's wrongful retention, however, the children must be re-

---

[4] Based on the Interim Report on Status of Return filed by Ms. Vilen-Burch on May 7, 2013, [dkt. 36], it appears that return of the children to Finland may take place between May 15, 2013 and May 17, 2013 due to the need to acquire current United States and Finnish passports for S. The language in the May 1, 2013 Order requiring return to Finland within seven days unless Ms. Vilen-Burch and Mr. Burch reached an agreement otherwise was to address a situation like the one at hand, where time is needed to get travel paperwork in order. It was not meant to convey any expiration date.

turned to Finland until a detailed custody agreement acceptable to both Ms. Vilen-Burch and Mr. Burch can be put in place.

05/08/2013

                                              Hon. Jane Magnus-Stinson, Judge
                                              United States District Court
                                              Southern District of Indiana

**Distribution via ECF only:**

Amy Kathleen Noe
amy@amynoelaw.com

**Distribution via U.S. Mail and E-mail:**

Jerry L. Burch
1369 W. Dun Grazin Dr.
Connersville, IN 47331